ORAL ARGUMENT NOT YET SCHEDULED

Case No. 13-7033

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA

_____

INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS, LOCAL 1200

Plaintiff-Appellant

v.

DETROIT FREE PRESS, INC., a subsidiary of
GANNETT CO., INC. d/b/a WUSA-TV

Defendant-Appellee

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

**BRIEF FOR APPELLANT**

_____

Robert E. Paul, Esq.
ZWERDLING, PAUL, KAHN & WOLLY, PC
1025 Connecticut Avenue NW, Suite 712
Washington, DC 20036-5420
 (202) 857-5000
 (202) 223-8417 fax
 rpaul@zwerdling.com

*Counsel for Appellant*

## CERTIFICATE
## AS TO PARTIES, RULINGS, AND RELATED CASES

Appellant International Brotherhood of Electrical Workers, Local 1200,

pursuant to the Rules of this Court, states as follows for its Certificate as to Parties,

Rulings and Related Cases.

A.  Parties, Intervenors and Amici Curiae

The Appellant, plaintiff below, is the International Brotherhood of

Electrical Workers, Local 1200 ("IBEW").  The Appellee, defendant below, is The

Detroit Free Press, Inc., d/b/a/ WUSA-TV ("WUSA").   There are no intervenors

or amici curiae.

B.  Rulings Under Review

The ruling under review is the February 12, 2013 Memorandum

Opinion and Order of the United States District Court for the District of Columbia

in Civil Action 12-484, filed February 14, 2013.

C.   Related Cases

The undersigned counsel is not aware of any related cases pending in

this Court or any other Court.

# **TABLE OF CONTENTS**

**Page**

**TABLE OF AUTHORITIES** ....................................................... iii

**JURISDICTIONAL STATEMENT** ........................................... 1

**STATEMENT OF THE ISSUES** ............................................. 1

**STATEMENT OF THE FACTS** ............................................. 2

    A. The Relevant Terms of the Collective Bargaining
       Agreements ................................................................. 2

         1. Negotiations Must Precede Any Layoff .......................... 3

         2. Part-time Employees Must be Laid Off
            Before Any Full-Time Employee .................................... 4

         3. The Baseline: Layoffs Must Be Effectuated
            According to Seniority ..................................................... 4

         4. Any Layoff is a Two-Step Process ................................. 4

    B. The Layoff of Technician Karen Peterson ................................ 5

**SUMMARY OF ARGUMENT** .................................................. 7

**ARGUMENT** ........................................................................ 9

THE DISTRICT COURT ERRED BY NOT REQUIRING
WUSA TO ARBITRATE THE UNION'S GRIEVANCE........................ 9

    A. The Presumption of Arbitrability .............................................. 9

    B. Arbitration is Required Because, Under the "Normal
       Principles of Contract Interpretation" Standard,
       The Layoff Provision Survives the
       Agreement's Expiration .............................................................. 12

i

C.  The Union's Grievance Implicates Seniority Rights
Which Accrued or Vested Over Time and Therefore
Survived the Agreement's Expiration ......................................    18

D.  The Grievance Presents an Arbitrable Issue Under
the 2012 Agreement ..................................................    24

**CONCLUSION** ......................................................................    29

**ADDENDUM**

# TABLE OF AUTHORITES

**Page**

## Cases

*AT&T Technologies v. Communications Workers of America*,
475 U.S. 643 (1986) ......................................................... 10

*Burns Int'l Sec. Services v. N.L.R.B.*,
146 F.3d 873 (D.C. Cir. 1998) ......................................... 13

*Carlsen v. Quebecor Printing*, 94-10661-RCL,
1996 WL 224599 (D. Mass.) ............................................ 14

*Cincinnati Typographical Union No.3, Local 14519, Comm.
Workers of Am. AFL-CIO v. Gannett Satellite Info
Network, Inc.*, 17 F.3d 906 (6th Cir. 1994) ...................... 19, 21

*Cumberland Typographical Union No. 244 v. The Times
and Alleganian Company*, 943 F.2d 401 (4th Cir. 1991) ................ 22

*Litton Financial Printing Division v. NLRB*,
501 U.S. 190 (1991) ........ 8, 11, 12, 13, 14, 15, 16, 17, 19, 20, 21, 22, 23

*Local Union 813, Int'l Broth. of Teamsters v. Waste
Mgmt. of NY, LLC*, 469 F. Supp. 2d 80 (E.D.N.Y. 2007) ............... 14

*Madison Hotel v. Hotel & Rest. Employees, Local 25, AFL-CIO*,
144 F.3d 855 (D.C. Cir. 1998) ......................................... 13

*Mail-Well Envelope, Cleveland Division v. IAM*,
916 F.2d 344 (6th Cir. 1990) .......................................... 27

*Mount Ararat Cemetery v. Cemetery Workers & Greens
Attendants Union, Local 365, S.E.I.U., AFL-CIO*,
975 F. Supp. 445 (E.D.N.Y. 1997) .................................... 15

\* Authorities upon which we chiefly rely are marked with asterisks.

*National R.R. Passenger Corp. v. Lexington Ins. Co.,*
        357 F. Supp. 2d 287 (D.D.C. 2005) ................................................. 25, 26

*\*Nolde Bros. v. Bakery & Confectionery Workers Local 358,*
        430 U.S. 243 (1977) ....................................................................... 11, 19

*Steelworkers v. American Mfg. Co.*, 363 U.S. 564 (1960) ...................... 10

*Steelworkers v. Enterprise Wheel & Car Corp.,*
        363 U.S. 593 (1960) ........................................................................ 10

*Steelworkers v. Warrior and Gulf Navigation Co.,*
        363 U.S. 574 (1960) ........................................................................ 10

*Tillery v. Washington Post,* CIV. A. 04-2258 RJL,
        2006 WL 709805 (D.D.C. Mar. 13, 2005),
        *aff'd sub nom., Tillery v. The Washington Post*,
        232 F. App'x 1 (D.C. Cir. 2007) ....................................................... 13

*Townsend v. Pinnacle Entertainment, Inc.,*
        457 Fed. Appx. 205 (3rd Cir. 2012) ................................................. 12

*Typographical Union No.3, Local 14519, Comm. Workers*
        *of Am. AFL-CIO v. Gannett Satellite Info Network, Inc.*,
        17 F.3d 906, 910 (6th Cir. 1994) ...................................................... 15

*\*United Steel, Paper & Forestry, Rubber, Mfg., Energy,*
        *Allied Indus. & Serv. Workers Int'l Union,*
        *AFL-CIO/CLC v. American Standard Corp.*,
        2010 WL 387186 (E.D. Ky. Sept. 28, 2010),
        *aff'd*, 487 F. App'x 234 (6th Cir. 2012) ...................................... 15, 19, 20

*Unite HERE Local 25 v. Madison Ownership, LLC*,
        2012 WL 983167 (D.D.C. March 23, 2012) ..................................... 18

*United Steelworkers of America v. Fort Pitt Steel*
        *Casting Division*, 598 F.2d 1273 (3th Cir. 1979) ............................. 13

*United Parcel Serv., Inc. v. Union de Tronquistas de Puerto Rico,*
        *Local 901*, 426 F.3d 470 (1st Cir. 2005) ........................................ 20, 23

*Washington Mailers Union No. 29 v. The Washington Post*,
      233 F.3d 587 (D.C. Cir. 2000) ...................................................... 9, 11, 22

*Washington Mailers Union Local M-29 v. The Washington Post*,
      699 F. Supp. 2d 130 (D.D.C. 2010) .............................................. 13, 22

## **Statutes**

28 U.S.C. §1291 .......................................................................................  1

28 U.S.C. §1331 .......................................................................................  1

29 U.S.C. § 185 .......................................................................................  1

## JURISDICTIONAL STATEMENT

The District Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, and Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The District Court issued its final Order on February 14, 2013.   The International Brotherhood of Electrical Workers, Local 1200 ("IBEW" or "the Union") filed a timely Notice of Appeal on March 2, 2013.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1.  Did the District Court err by not requiring WUSA-TV to arbitrate a grievance where the right to arbitrate survived the expiration of the collective bargaining agreement because the underlying employer action infringed seniority rights which accrued or vested under the agreement?

2.  Did the District Court err by not requiring WUSA-TV to arbitrate a grievance challenging a layoff that WUSA undertook pursuant to the agreement where, under normal principles of contract interpretation, the contract's layoff provisions and therefore the right to arbitrate survived the expiration of the agreement?

3.  Did the District Court err by not requiring WUSA-TV to arbitrate a grievance challenging a layoff under the terms of a successor collective bargaining

1

agreement when the second stage of the agreement's two-stage layoff procedure

occurred when the new agreement was in effect?

## STATEMENT OF THE FACTS[1]

A.  The Relevant Terms of the Collective Bargaining Agreements

The IBEW is the exclusive collective bargaining representative of a unit of

approximately 50 WUSA "technicians."  JA 20, 116(¶¶3-4).  The IBEW and

WUSA were parties to a collective bargaining agreement for this unit that by its

terms covered the period December 29, 2008 through December 31, 2010

(hereinafter referred to as the "2008 Agreement").  At the IBEW's request, the

parties commenced negotiations for a successor agreement in November 2010.

The IBEW and WUSA then agreed to extend the term of the 2008 Agreement

through February 28, 2011, and negotiations continued towards a new collective

bargaining agreement.  JA 6(¶7), 110(¶7).

The provisions of the 2008 Agreement constituted the terms and conditions

of employment of bargaining unit employees during the hiatus between contracts.

WUSA did not notify the IBEW of any change, and did not implement any change,

in any of those terms and conditions during the entire period of negotiations for a

---

[1]  These facts are supported with citations to the Joint Appendix ("JA"), filed
herewith.

2

successor contract.  The "status quo" included the long-established seniority rights

of all unit employees.  JA 117((¶6).

On February 3, 2012, the parties arrived at a successor collective bargaining

agreement, which became effective, upon ratification by the bargaining unit

February 9, 2012 (hereinafter referred to as the "2012 Agreement").  It runs

February 9, 2012 through February 8, 2014.  JA 13-102, 117(¶7).

The 2008 Agreement and the 2012 Agreement are identical with regard to

the rights and obligations attendant to any layoff of unit employees.  Each of these

rights, specifically including the technicians' seniority rights remained in full force

and effect between the two contracts, just like vacation and other similar rights.[2]

The employees continued to accrue seniority throughout the interim.  These rights

and obligations include the following explicit restrictions:

1. <u>Negotiations Must Precede Any Layoff</u>.  Pursuant to the "Side

Letter A of Intent," a term of employment in both collective bargaining agreements

and which remained in effect during the negotiations, WUSA is required to engage

---

[2]  While the parties were at the table, WUSA sought an agreement from the IBEW, which it asked to be effective immediately, so that a new chief photographer classification could then be created and, thus, his seniority rights would be protected even as the parties continued to negotiate the new agreement.   Seniority rights have always been "sacred" to the Union and, more importantly, remained in place at all times.  JA 235(¶5), 236(¶7),238(¶6), 239(¶¶8-9).

in negotiations with the Union prior to any decision to layoff any employee.  The

agreements state:

> Should the Station need to exercise its contractual rights to lay off one or
> more Core Technicians it *must first bargain* with the union in good faith on
> alternatives to avoid a layoff including buy-outs or early retirement
> incentives.  *Only in the event that those negotiations are unsuccessful may
> the station lay off one or more Core Technicians*.

JA 89(¶7), emphasis added.  The term "Core Technicians" is defined as all non-

probationary full- and part-time technicians.  *Id.*

      2.  <u>Part-time Employees Must be Laid Off Before Any Full-Time</u>

<u>Employee.</u>   Pursuant to "Side Letter Part-Time," WUSA committed that "[p]art-

time Technicians shall be laid off prior to the lay-off of any full-time Technicians."

JA 84(¶8).

      3.  <u>The Baseline: Layoffs Must Be Effectuated According to</u>

<u>Seniority</u>.  Under Section 4.17 of the contracts, "Layoffs on account of reduction of

staff, as stipulated in paragraph (A) of this Section, shall be made in inverse order

of seniority with the Employer in the classification in which the technician is

employed."  JA 58(Section 4.17(D))[3]

      4.  <u>Any Layoff Is a Two-Step Process.</u>  When layoffs are effectuated

according to seniority, the agreements also require WUSA to "give such

---

[3]  Under the contracts, WUSA may select a more senior employee only if it
demonstrates that "not to retain such lesser seniority employee(s) would have an
adverse effect on the operation of the Station when all factors are considered."  JA
59(Section 4.17(F)).

Technician(s) notice in writing two (2) weeks in advance, *and* on the effective date of the layoff, grant him a service letter."  JA 57-58(Section 4.17(A)).  Emphasis added.  Thus, Section 4.17(A) mandates a two-stage process for any employee to be laid off:  two weeks' advance written notice before a layoff and, after the passage of the two week period and on the effective date of the layoff, a service letter from the employer.

### B.  The Layoff of Technician Karen Peterson

WUSA hired Karen Peterson as a full-time maintenance technician in 1990. Throughout her employment, Peterson was a member of the bargaining unit represented by the Union and covered by the terms of the aforementioned agreements.  By January 2012, Peterson had become the most senior (i.e., had the greatest employment seniority) of the defendant's six full-time maintenance technicians.  JA 9-10(¶15), 111(¶15).

On January 30, 2012, Victor Murphy, WUSA's supervisor of its technicians, informed Joseph Zentner, the IBEW's chief steward, that a layoff notice was about to issue.  In making this statement to Zentner, Murphy specifically cited the seniority provision of the 2008 contract as the basis for WUSA's actions.  Murphy pointed to the 2008 collective bargaining agreement, which was open on his desk during the exchange, and told Zentner that the station was exercising what it

5

believed to be its rights under Section 4.17 of that agreement to select Peterson for layoff.   Shortly thereafter, WUSA handed a letter to Peterson, signed by WUSA General Manager Allan Horlick, announcing that, despite her seniority, she was being laid off.  JA 103-04.

Prior to the issuance of the letter, WUSA had not entered into any negotiations with the IBEW regarding the possibility of a layoff, nor had it laid-off any of its part-time employees.  JA 118(¶11).  Horlick's letter suggested that Peterson's position was being "eliminated effective today, January 30, 2012" but emphasized that the layoff "*is being undertaken in accordance with the IBEW collective bargaining agreement*."  JA 103-04, emphasis added.  As a result, the letter closed with WUSA's recognition that the second-step of the process, mandated by Section 4.17(A) to take place on the effective date of the layoff, was yet to come:  "*We will provide you with a service letter* and will be available to answer any questions you may have."  *Id*.

As noted, the 2012 Agreement became effective on February 9, 2012, prior to the expiration of the two-week period required by the contract for Peterson's layoff to become effective.  On or about February 16, 2012, the IBEW filed a formal grievance contesting the layoff as violative of several provisions of the collective bargaining agreements.  JA 105.  The Union challenged the layoff on the ground that it violated (a) the precondition of good faith negotiations in advance of

6

any layoff, (b) the requirement that part-time employees be laid off before any full-time employees, and (c) Peterson's seniority rights.  JA 117-18(¶¶7, 12).

On or about March 13, 2012, the parties' representatives met to consider the grievance.  Upon the conclusion of the meeting, when it became evident that the parties could not resolve their dispute, the IBEW informed WUSA that it would submit the grievance to final and binding arbitration under Section 2.01 of the collective bargaining agreement.  WUSA's representatives replied that the company would not arbitrate the dispute on the ground that there was no collective bargaining agreement in force on January 30, 2012, when the layoff was announced.   The IBEW disagreed and argued that WUSA was required to and did maintain all of the provisions of the 2008 Agreement during the pendency of negotiations, and that, in any event, the grievance and arbitration provisions of the 2012 Agreement were in full force and effect on February 16, 2012, the date of the grievance, as well as on February 13, 2012, the effective date of Peterson's layoff. JA 118(¶13).


## SUMMARY OF ARGUMENT

For over fifty years, federal labor policy has favored the arbitration of contractual disputes.  The Supreme Court has repeatedly held that there is a presumption in favor of arbitration of contractual grievances, including those that

surface after the expiration of a labor agreement. The test is whether it may be said that the dispute arises under that contract. Under *Litton Financial Printing Division v. NLRB*, 501 U.S. 190 (1991), post-expiration disputes are arbitrable if they involve accrued or vested rights, or where it may be said, simply under normal principles of contract interpretation, that the dispute involves rights that survive expiration. The ruling below fails to comport with these bedrock principles.

Here, IBEW and WUSA are parties to two successive, comprehensive labor agreements which include broad arbitration rights and explicit pre-conditions to the layoff of any bargaining unit employee. The district court disregarded the undisputed record that established the arbitrability of this dispute, and erroneously concluded that the particular seniority rights implicated here do not involve accrued or vested rights. WUSA's own oral and written contemporaneous statements, which the district court casually brushed aside, amply demonstrate that the rights implicated in the grievance survived the expiration of the contract.

Additionally, the district court erroneously found that this dispute is not arbitrable under the terms of the successor contract. The Court restricted its focus to the date of Peterson's layoff notice rather than the effective date chosen by the parties under the labor agreements. Under the terms of both agreements, the layoff of any employee requires a two-step process which, by definition, at least arguably

8

placed the actual effective date of Peterson's layoff <u>after</u> the new labor agreement was in effect.  Under this Court's ruling in *Washington Mailers Union No. 29 v. The Washington Post*, 233 F.3d 587 (D.C. Cir. 2000), and the rulings of the Supreme Court, lower courts are admonished to avoid a consideration of the merits of the dispute.  Here, instead, the district court invaded the province of the arbitrator by addressing the merits of the underlying claims over the effective date of the layoff rather than confining its analysis, as it was required to do, to whether the arbitration clause is susceptible of an interpretation that covers this controversy.

## ARGUMENT

### THE DISTRICT COURT ERRED BY NOT REQUIRING WUSA TO ARBITRATE THE UNION'S GRIEVANCE

#### A.  The Presumption of Arbitrability

For over fifty years, the Supreme Court has recognized that labor arbitration lies at the cornerstone of federal labor policy.  "[A]rbitration is the substitute for industrial strife," *Steelworkers v. Warrior and Gulf Navigation Co.,* 363 U.S. 574, 578 (1960), and "arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself." *Id.*  In the

9

Steelworkers Trilogy,[4] the Court held that "[a]part from matters that the parties specifically exclude, all of the questions on which the parties disagree must therefore come within the scope of the grievance and arbitration provisions of the collective bargaining agreement." *Id.* at 581.

In *AT&T Technologies v. Communications Workers of America*, 475 U.S. 643, 649 (1986), the Court declared that the only question before a court when confronted with a motion to compel arbitration is whether the parties intended to arbitrate the dispute, "not...the potential merits of the underlying claim."  The Court emphasized, in answering this question, the liberal construction which is to be afforded arbitration provisions of labor agreements.

> Finally, it has been established that where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage." *Warrior & Gulf*, 363 U.S. at 582-83.  See also *Gateway Coal Co. v. Mine Workers, supra*, at 377-378.  Such a presumption is particularly applicable where the clause is as broad as the one employed in this case, which provides for arbitration of "any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder...."  In such cases, "[i]n the absence of any express provision excluding a particular grievance from arbitration, we

---

[4] *Steelworkers v. American Mfg. Co.*, 363 U.S. 564 (1960); *Warrior & Gulf Navigation Co., supra*; *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960).

> think only the most forceful evidence of a purpose to
> exclude the claim from arbitration can prevail." *Warrior
> & Gulf, supra*, at 584-585.

*Id.* at 650.

Similarly, in *Washington Mailers Union No. 29 v. The Washington Post*,

233 F.3d 587 (D.C. Cir. 2000), this Court observed:

> The determination of whether a dispute is arbitrable under a collective
> bargaining agreement is a question of law for the court, unless the parties
> unmistakably agree to submit the issue of arbitrability to arbitration. [citing
> *AT&T*].  But "in deciding whether the parties have agreed to submit a
> particular grievance to arbitration, a court is not to rule on the potential
> merits of the underlying claims." Id.  And if a contract includes an
> arbitration clause, a presumption of arbitrability arises, meaning "[a]n order
> to arbitrate the particular grievance should not be denied unless it may be
> said with positive assurance that the arbitration clause is not susceptible of
> an interpretation that covers the asserted dispute.  Doubts should be resolved
> in favor of coverage."  Id., at 650....

233 F.3d at 589, emphasis added.

When a grievance is filed after the expiration of a contract, the Supreme

Court has ordered arbitration if the dispute arises under the expired agreement,

noting that the "presumptions favoring arbitrability must be negated expressly or

by clear implication" in order to avoid arbitration of that dispute.  *Nolde Bros. v.*

*Bakery & Confectionery Workers Local 358*, 430 U.S. 243, 255 (1977).  In *Litton*

*Financial Printing Division v. NLRB*, 501 U.S. 190 (1991), the Court outlined

three scenarios in which a post-expiration grievance arises under an expired

contract and, thus, where there is an obligation to arbitrate:  where it involves

11

"facts and occurrences that arose before expiration"; where the action "infringes a right that accrued or vested" under the now-expired agreement; or where, through "normal principles of contract interpretation," it can be said that the disputed right "survives" expiration.  *Id.* at 206.  If any of these circumstances are present, the presumption in favor of arbitration attaches.

Stated succinctly, the question "[w]hether a post-termination dispute 'arises under the contract' depends on whether there is a link between the post-termination dispute and the underlying agreement."  *Townsend v. Pinnacle Entertainment, Inc.,* 457 Fed. Appx. 205, 209, n. 2 (3rd Cir. 2012).

### B.  Arbitration is Required Because, Under the "Normal Principles of Contract Interpretation" Standard, The Layoff Provision Survives the Agreement's Expiration.

It is well-established under *Litton* that arbitration of a grievance filed after contract expiration is required if under "normal principles of contract interpretation" those rights survived the expiration of the agreement.  *Id.* at 206. The Court noted,

> And *of course*, if a collective-bargaining agreement provides in explicit terms that certain benefits continue after the agreement's expiration, disputes as to such continuing benefits may be found to arise under the agreement, and so become subject to the contract's arbitration provisions.

12

*Id.* at 207-208, emphasis added.[5]  While it is axiomatic - hence the Court's "of course" - that a contract provision which "explicitly" continues benefits after expiration would be arbitrable,[6] *Litton* does not require such an explicit statement. 501 U.S. at 206-208.  Rather, "normal principles of contract interpretation" include consideration of implied terms, past practice and industrial common law as well. *Burns Int'l Sec. Services v. N.L.R.B.*, 146 F.3d 873, 876-77 (D.C. Cir. 1998); *Madison Hotel v. Hotel & Rest. Employees, Local 25, AFL-CIO*, 144 F.3d 855, 859 (D.C. Cir. 1998).  All of these interpretative aides may be utilized to determine arbitrability.  *See id; Litton*, 501 U.S. at 206-209 ("…[W]e must determine whether the parties agreed to arbitrate this dispute, and we cannot avoid that duty because it requires us to interpret a provision of a bargaining agreement.").

---

[5]  The case cited by the Court, *United Steelworkers of America v. Fort Pitt Steel Casting Division*, 598 F.2d 1273 (3th Cir. 1979), is but one of this subset of cases. There, the contract expressly provided that health benefits were to continue after the expiration of the contract, and the Third Circuit upheld the company's obligation to arbitrate its dispute.  *Litton* did not restrict the third "normal principles of contract interpretation" test only to those situations where the contract is explicit, but simply cited *Fort Pitt* as just one type of situation in which, under principles of contract interpretation, a dispute arises under an expired agreement.

[6]  Of course, there are cases - such as *Tillery v. Washington Post,* CIV. A. 04-2258 RJL, 2006 WL 709805 at *2 (D.D.C. Mar. 13, 2005), *aff'd sub nom. Tillery v. The Washington Post*, 232 F. App'x 1 (D.C. Cir. 2007), and *Washington Mailers Union Local M-29 v. The Washington Post*, 699 F.Supp. 2d 130, 133 (D.D.C. 2010) -- where that is the issue, but any notion that *Litton* requires contract language explicitly stating that benefits continue after expiration constitutes a fundamental misreading of the Court's opinion.

In *Carlsen v. Quebecor Printing*, 94-10661-RCL, 1996 WL 224599 at *5-6

(D. Mass.), the company contended that it was not obligated to arbitrate a post-

expiration grievance unless the contract explicitly required it.  The district court

had little difficulty in concluding that such an approach was incompatible with

*Litton*:

> First, it is clear from the wording and context of the statement that the Court was only giving an illustration of one way, among others, in which a post-termination obligation might arise. Second, if the Court were announcing an important new rule of contract interpretation applicable only to collective-bargaining agreements, it is highly unlikely that it would have done so in such an offhand manner.  Third, in an earlier portion of the same opinion, the Court clearly stated that post-expiration duties might arise even though they were not explicitly set forth in the agreement. . . .Specifically, the Court noted that constraints on an employer's activities after the expiration of a collective-bargaining agreement "may arise...from the express or implied terms of the expired agreement itself.". . . .Finally, in the same section of the opinion in which the Court made the statement upon which [the company] relies, the Court also noted that a post-expiration duty might be found where, "under normal principles of contract interpretation," the disputed right survived. . . .For all these reasons, [the company] is mistaken in its belief that, as a matter of federal labor law, it cannot be held responsible for making post-termination contributions unless the duty to do so is explicitly set forth in the CBA.[] Ordinary principles of contract construction will determine if such duty exists, whether by express terms of the CBA or by implication.[]

*Id.* (internal citations and footnotes omitted).  Similarly, in *Local Union 813, Int'l*

*Broth. of Teamsters v. Waste Mgmt. of NY, LLC*, 469 F. Supp. 2d 80, 84-85

(E.D.N.Y. 2007), the court rejected the same plea.

[Defendant] contends that *Litton* requires express language indicating the continuation of terms from the expired contracts. That reading of *Litton* is overbroad. True, the Court in *Litton* stated that, "if a collective bargaining agreement provides in explicit terms that certain benefits continue after the agreement's expiration," 501 U.S. at 207, 111 S.Ct. at 2226, then post-expiration disputes over those benefits would be covered by an arbitration clause; however, the Court's reference to "explicit terms" was simply the paradigmatic example of when an arbitration clause would most clearly apply. The analytical framework articulated by the Court remains grounded in "normal principles of contract interpretation." *Id.* at 206, 111 S.Ct. at 2225. Because the Court noted that a "duty may arise as well from the express or implied terms of the expired agreement itself," id. at 203, 111 S.Ct. at 2224 (emphasis added), it follows that other principles of contract interpretation, including the common law principle that parties, by their conduct, may extend the terms of a contract, are also applicable to determine whether contract terms apply post-expiration.

*Id.*[7]

---

[7]  *See also Mount Ararat Cemetery v. Cemetery Workers & Greens Attendants Union, Local 365, S.E.I.U., AFL-CIO*, 975 F. Supp. 445, 448 (E.D.N.Y. 1997) (Regarding the third *Litton* exception, "Local 365 is correct in its assertion that a court may consider extrinsic evidence to explain ambiguous or uncertain meanings of contract terms."); *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO/CLC v. Am. Standard Corp.*, 2010 WL 3871836 at *5 (E.D. Ky. Sept. 28, 2010), *aff'd*, 487 F. App'x 234 (6th Cir. June 21, 2012) ("American Standard also argues that there is no provision in the agreement that provides that the right to separation pay survives the contract's expiration.  If true, then the right cannot fall into the third *Litton* category.  But, again, the fact that there is no contractual provision that implicitly or explicitly provides that the right to separation pay survives the contract's expiration does not mean that the right is not accrued or vested under the agreement."); *c.f. Cincinnati Typographical Union No.3, Local 14519, Comm. Workers of Am. AFL-CIO v. Gannett Satellite Info Network, Inc.*, 17 F.3d 906, 910 (6th Cir. 1994) ("[A] court may use standard principles of contract interpretation to determine whether a right is vested" and may look to "extrinsic evidence to support that conclusion.")

15

In the instant case, the District Court failed even to consider the core "normal principle of contract interpretation" question. Instead, the Court limited its examination to whether the grievance involved facts or circumstances that occurred prior to the expiration of the 2008 Agreement and whether it involved accrued or vested rights. JA 250-51. The IBEW did not contend the former, and we address the latter question below. In this case, the IBEW's grievance over seniority and related rights surrounding Peterson's layoff squarely concerns rights that under the "normal principles of contract interpretation" approach in *Litton* survived the expiration of the collective bargaining agreement.

First, the company's notice letter itself demonstrates that Peterson's rights, and those of the IBEW, survived the expiration of the contract. While the January 30, 2012 notice letter was announced to the IBEW and handed to Peterson on a date when the 2008 agreement had expired, it nonetheless expressly states that "*the determination to eliminate your position is being undertaken in accordance with the IBEW collective bargaining agreement.*" JA 103-04, emphasis added. The letter additionally provides that Peterson is entitled to recall rights and severance pay, both - as it states - under "*this agreement*" and "*the agreement*." *Id*., emphasis added. These statements are nothing less than an admission that Peterson's layoff rights – and, therefore, the opportunity to vindicate those rights through arbitration – survived the expiration of the 2008 agreement.

16

Furthermore, Ms. Peterson's supervisor, Victor Murphy, <u>specifically cited the seniority provisions of the 2008 contract as the basis for the defendant's actions</u> when he informed the Union on the morning of January 30, 2012 that a layoff notice was about to issue. Murphy had a copy of the 2008 collective bargaining agreement open on his desk during his discussion with the IBEW shop steward and told him that the company was exercising what it believed to be its rights to select Peterson for layoff under Section 4.17 of that agreement. JA 240(¶10).

The District Court described the letter's reference to Peterson's rights merely as "curious[]." JA 246. We submit, however, that the letter's contents, let alone Murphy's contemporaneous statement, cannot be brushed aside so easily under *Litton*. Rather, the contents of the letter represent further and persuasive evidence that Peterson's seniority and related rights indeed survived the contract. As a factual matter, all of Peterson's seniority rights under the 2008 Agreement remained in force during the interim between contracts, just like her vacation and other similar rights. During that period, WUSA continued to honor and respect - with the exception of the issues raised by the Peterson grievance - the seniority rights of all bargaining unit employees. During that period, just as before expiration, employees selected vacation and other days off by their established seniority order. While the parties were at the bargaining table, WUSA asked for an agreement to be effective immediately, so that a new chief photographer's seniority

17

rights would protect him in the event of a layoff, even during the months between

agreements, a recognition that others did not need any special arrangement.

In short, the evidence undeniably establishes that contract seniority rights in the

2008 agreement survived its expiration and remained in place at all times even

between labor agreements.  They were, by the company's own contemporaneous

admissions, the source for its action.[8]  "Courts have not hesitated in enforcing

broad arbitration agreements over rights that 'arise under' a CBA, even if the CBA

thereafter expires or terminates."  *Unite HERE Local 25 v. Madison Ownership,*

*LLC*, 2012 WL 983167, at *7,n. 4  (D.D.C. March 23, 2012).  Under the

circumstances here, the District Court erred in failing to find that the grievance

unquestionably arises out of the 2008 contract and is therefore subject to

arbitration under that expired agreement.  See JA 235(¶5), 236(¶7), 238(¶6),

239(¶¶8, 9).


    C.  The Union's Grievance Implicates Seniority Rights Which Accrued or
        Vested Over Time and Therefore Survived the Agreement's Expiration.

     As noted, a grievance is arbitrable, despite the expiration of a contract if the

underlying action "infringes a right that accrued or vested under the agreement."

---

[8]  Given WUSA's reliance on the provisions of the 2008 contract when it
announced Peterson's layoff, the conclusion is inescapable that the other layoff
related obligations of that same contract - the sideletters - survived expiration of
that agreement.

*Litton*, 501 U.S. at 206.  In *Litton*, the contract provided that seniority would apply to layoffs only if all other factors were "equal."  Given the fluidity of those other factors - such as aptitude and ability - the Court found that the limited seniority accrual provision there did not provide for accrued or vested rights.  Yet, the Court cautioned that it was making no pronouncement about *all* seniority provisions. The Court expressly left "aside the question whether a provision requiring all layoffs to proceed in inverse order of seniority would support an analogy to the severance pay at issue in *Nolde Brothers*…."  501 U.S. at 210.

This is, we submit, precisely such a case.  The central question is whether Peterson's seniority rights had accrued or were vested rights.  *Id*.  "Attributes that suggest a right has accrued include factors that remain constant, that cannot improve or atrophy, and that can be measured on a universal scale."  *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO/CLC v. American Standard Corp.*, 487 F. App'x 234, 237 (6th Cir. 2012); *Litton*, *supra*, at 210.  "These are rights that can be worked toward or accumulated over time," *American Standard Corp.*, 487 F. App'x at 237, citing *Cincinnati Typographical Union No.3, Local 14519, Comm. Workers of Am. AFL-CIO v. Gannett Satellite Info Network, Inc.*, 17 F.3d 906, 911 (6th Cir. 1994), or "grow[] step-by-step."  *Id*. at *4.

19

The trial court mistakenly held that the rights involved in this case "are not the kind of rights that are *presumed* to accrue or vest." JA 250-51, emphasis added. The issue is not whether seniority rights in the abstract are "presumed" to do so, the issue is whether in fact they did. Here, the right that employees in the WUSA-IBEW bargaining unit have to their seniority satisfies all of the relevant criteria. It is worked-for; it accumulates over time; it grows "step-by-step;" it remains constant; and it can be easily measured.[9] Seniority is, as the First Circuit found with vacation benefits, "objectively quantifiable." *United Parcel Serv., Inc. v. Union de Tronquistas de Puerto Rico, Local 901*, 426 F.3d 470, 471 (1st Cir. 2005). The contract's primary rule is that "[l]ayoffs…shall be made in inverse order of seniority with the Employer in the classification in which the technician is employed." JA 58. This is a right that was firmly established and vested - and which, as WUSA acknowledged by the language in its notice, survived expiration.

Further, the District Court's statement that there is "no language" in the collective bargaining agreement which indicated a "mutual" intention to vest

---

[9] The District Court accepted WUSA's assertion that it has a limited right under the contract to trump an employee's seniority rights, and so held that the seniority rights here are not accrued or vested. JA 251. We disagree. First, the question as to whether Peterson's seniority rights were trumped is the merits question for an arbitrator, not for the court. Second, as discussed in *American Standard,* the issue under *Litton* is whether a right accrued *or* vested; either is sufficient. Here, Peterson's seniority was established over time and accrued to her. It was fixed and measurable. The company's argument that it could lay her off anyway does not detract from the fact that her *seniority* rights had accrued under the 2008 contract.

seniority rights does not square with the unambiguous language in the 2008

Agreement – let alone the undisputed actions of the parties.  The contract itself

represents a "mutual" intention to clothe bargaining unit employees with seniority

rights.  Moreover, until now, such right remained in effect even in the absence of a

collective bargaining agreement.   The issue, as phrased by the Supreme Court, is

whether there is an "infer[ence of] an intent on the part of the contracting parties to

freeze any particular order of layoff or vest any contractual right…." *Litton* at 210.

This may be determined by looking to extrinsic evidence. *Cincinnati*

*Typographical Union No.3,* 17 F.3d at 910.

　　　Here, the record is undisputed that the employees' seniority rights remained

in place, and continued to accrue, despite the expiration of the 2008 collective

bargaining agreement.    JA 117(¶6).  Several provision of the contract, separately

and collectively, establish a "particular order of layoff…."   As discussed, the

contract explicitly requires that there be negotiations before *any* layoff; that part-

timers must be laid off before full-timers, like Peterson; that the layoffs "shall be

made in inverse order of seniority in the classification in which the Technician is

employed," and that a layoff itself is not effective until WUSA follows a two-step

process.  JA 57-59.   Taken together, these provisions do "freeze [a] particular

order of layoff." *Litton,* 501 U.S. at 210.  And, unlike *Litton*, where "[t]he order of

layoffs under the Agreement was to be determined primarily with reference to

21

'other factors such as aptitude and ability,'" 501 U.S. at 210, here, there can no dispute that, under Section 4.17 of the Agreement, the core for the selection of employees for layoff is the employee's seniority date, period.

In *Washington Mailers Union,* 699 F.Supp. 2d at 131-32, The Washington Post discharged an employee with a "lifetime job guarantee" under the provisions of the prior collective bargaining agreements. The Post refused to arbitrate the union's grievance, filed when no contract was in force, on the ground that the termination took place after the expiration of the former contract. This Court held that the employee had a vested right in his position, and that because of the presumption of arbitrability, as well as the parties' "plausible" interpretation of the applicable provisions, the Post was required to submit the dispute to arbitration. *Accord*: *Cumberland Typographical Union No. 244 v. The Times and Alleganian Company*, 943 F.2d 401 (4th Cir. 1991).[10]

---

[10] There, the Fourth Circuit observed:

> …the termination of the collective bargaining agreement does not automatically extinguish the duty to arbitrate grievances which arose under that contract. A dispute "arises under" the agreement when it concerns an obligation <u>arguably</u> created by the expired agreement, so that the resolution of the claim hinges on the interpretation ultimately given to the contract clause which engendered the claim. The [Supreme] Court further held [in *Nolde Bros.*] that the strong presumption favoring arbitrability must be negated expressly or by clear implication that the parties intended their arbitration duties to terminate automatically with the end of the contract.

943 F.2d at 404-05, emphasis added.

In *United Parcel Service, Inc., v. Union de Tronquistas de Puerto Rico*, 426 F. 3d 470 (1st Cir. 2005), the court considered whether a grievance over accrued vacation pay was arbitrable under the terms of an expired contract. The First Circuit held that the vacation accrual provision was "materially different" from the seniority language in *Litton*, noting that here the benefit was "objectively quantifiable." 426 F.3d at 473. The court found that the "measure [of an employee's vacation entitlement] in days earned would remain constant over time, much like a deposit in a bank" and that "vacation time…[is a] classic example of a benefit that - barring explicit provision to the contrary - accrues during the term of the agreement under which it is earned." *Id.*, at 473-74. The court concluded that the vacation time grievance "has its real source in the contract," and, thus, was arbitrable.

The same results should obtain herein. This particular seniority provision is readily distinguishable from the loose seniority language of the contract in *Litton*. Here, the rights are as quantifiable as an employee's vacation entitlement - measurable, demonstrable and sourced in the contract. As such, a grievance over a layoff that contravenes these established seniority rights is arbitrable despite the expiration of the contract. WUSA's notice to Peterson, with its repeated references to her rights under the old contract, underscores that those rights endured beyond the expiration of the agreement.

23

D.  The Grievance Presents an Arbitrable Issue Under the 2012 Agreement.

Under the provisions of both the 2008 Agreement and the 2012 Agreement, the layoff of any bargaining unit employee requires several critical preconditions and, once those requirements have been fulfilled, the actual layoff must be conducted in two stages.  Under Section 4.17(D), an employee must first be afforded two weeks' advance notice of his/her layoff, and, "on the effective date of the layoff," is to receive a "service letter."   JA 57-58.  These twin requirements are included in both the 2008-10 and 2012-14 collective bargaining agreements, and remained in force during the hiatus between contracts.

WUSA's January 30, 2012 notice to Peterson points to these specific requirements, and notes, in its penultimate sentence, that the station "*will* provide you" with a service letter – the letter which, under the labor agreement, must be tendered "*on the effective date*" of a layoff.  JA 103-04, emphasis added.  Given the "two week *advance*" notice required by both agreements, the actual effective date of Peterson's layoff plainly fell during the term of the 2012-14 contract.

As a result, the undisputed record establishes that WUSA may have sought to notify Ms. Peterson on January 30, 2012 that she was being laid off, but that under the contract language - the very language referenced in her layoff notice - the layoff was not, nor could it be, effective until two weeks later on February 13, 2012, four days after the new collective bargaining agreement took effect.  The

24

notice was being tendered, as WUSA acknowledged at the time, "in accordance with the [2008] IBEW collective bargaining agreement."  Thus, the station had an obligation to maintain Peterson's pay for the January 30-February 13, 2012 "advance" notice period before it could actually lay her off, if the layoff was in conformity with her seniority rights.  By that later date, the 2012 Agreement was in full force and effect, including its grievance and arbitration provisions.

Yet, the District Court found that the IBEW's claim accrued on January 30, 2012, the date of the letter - when WUSA purported to effectuate Peterson's layoff.  In reaching this finding, we submit that the Court erred and, in so doing, exceeded its limited authority under *Nolde*.  At best, WUSA's January 30, 2012 letter constituted an anticipatory repudiation of its obligations to Peterson and to the IBEW membership as a whole.  But, under settled law, an anticipatory repudiation may be treated as a breach only if two conditions are met - if it is unequivocal, and if the other party treats it as a breach.  "'[A] declaration of intent by a promisor not to perform the contract can become a breach if the promisee elects to treat it as such [and] if the repudiating party 'communicated…unequivocally and positively its intent not to perform.'" *National R.R. Passenger Corp. v. Lexington Ins. Co..,* 357 F. Supp. 2d 287, 294 (D.D.C. 2005).   There, insurance companies contended that a statute of limitations had expired barring Amtrak's claim under an insurance contract.  Amtrak argued that notices from the carriers that they would not cover

25

the claim were not unequivocal, and that it did not treat the communications as a breach. This Court held that the letters did not unequivocally communicate a repudiation of its obligations, but that, in any event, "the facts do not show that Amtrak treated this communication as a breach." 357 F. Supp. 2d at 295.

> Where an "injured party [does not treat a repudiation as a present breach and] instead opts to await performance, the cause of action accrues, and the statute of limitations commences to run, from the time fixed for performance rather than from the earlier date of repudiation." *Franconia Assocs. [v. U.S*., 536 U.S. 129] at 144, 122 S. Ct. 1993.

*Id*.

This is precisely the situation in the case at bar. WUSA's January 30, 2012 letter may have sought to announce Peterson's layoff, but it was a statement of an anticipatory repudiation of its obligations. Here, the January 30, 2012 letter is hardly unequivocal. While it does purport to lay Peterson off "effective today," it also specifically references that the layoff is to be in accordance with the contract and that she "will"- thus at a later date - receive a service letter. Since WUSA's obligation to provide a service letter is one that matures on the "effective date of the layoff," and since WUSA made it clear that the letter would be forthcoming *after* January 30, 2012, the January 30, 2012 announcement is not an unequivocal repudiation of defendant's obligations.

Further, there is no evidence, nor could there be, that the IBEW treated the January 30, 2012 communication as a breach. Instead, the IBEW awaited WUSA's

26

performance of its obligations, and when that performance - the tendering of a service letter on the effective date of the layoff - was not forthcoming, the grievance was filed.  In short, the IBEW challenged WUSA's action based on the "time fixed for performance rather than from the earlier date of repudiation." *Lexington Ins. Co., supra*.  Under these circumstances, the lower Court erred in finding that the date on the letter bars the arbitrability of the Union's grievance.

In the end, WUSA is obligated to arbitrate every timely grievance filed during the term of the February 9, 2012-February 8, 2014 contract.  The instant grievance <u>was</u> filed during that term.  Accordingly, had no right to refuse the IBEW's demand to arbitrate IBEW's challenge to Peterson's improper layoff.

This grievance is akin to what the Sixth Circuit held in *Mail-Well Envelope, Cleveland Division v. IAM¸* 916 F.2d 344 (6th Cir. 1990) is a substantively arbitrable issue.  There, the employer discharged three employees during a strike that occurred after the expiration of the contract and the union filed a grievance, under the successor contract, to challenge the employer's failure to return these employees to work.   The employer argued that the new contract provisions did not govern the pre-contract terminations, but the Sixth Circuit observed that the validity of that contention had "nothing to do with the duty to arbitrate."   916 F.2d at 347.

> The key to solving this vexing question [to what extent do we need to consider the merits], we believe, is simply to look to the grievance and

27

arbitration provisions in the CBA as we are directed to do by *AT&T Technologies.*  In doing so, we cannot say "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."

*Id.* at 348.   "Thus, we conclude, it is for an arbitrator to interpret and apply these provisions of the CBA and thereby determine whether these discharged employees would be entitled to relief if they were not discharged for 'cause,' and, if so, whether they were discharged for 'cause.'"   *Id.*

Here, as well, the broad arbitration clause in the 2012 Agreement requires arbitration of all "grievances, disputes, complaints or questions in respect to the interpretation of this Agreement."   JA 33.  WUSA's contention that it was privileged to ignore the express, substantive restrictions on its right to lay Peterson off, and when that layoff became effective, is for an arbitrator to determine. Because the grievance concerns the interpretation of those contract provisions, it is a matter within the scope of the sweeping breadth of the arbitration provisions of the agreement.  As in *AT&T,* it cannot be said "with positive assurance" that the instant grievance and arbitration provision "is not susceptible of an interpretation that covers the asserted dispute."   475 U.S. 643, 650.

In the end, WUSA informed Peterson on January 30, 2012 that her layoff was being implemented in accordance with the contract, and that it "will"- a clear reference to a later date - provide her with the service letter that both agreements require  be tendered on the "effective date" of the layoff.  WUSA could not, and

28

did not, fuse two discrete steps - one, a notice, and the second, the effective date of

the layoff - into a single event, thereby eradicating her rights and those of the

union.  By refusing to find that the grievance raised an arbitrable matter under the

2012 Agreement, the District Court committed legal error.


## CONCLUSION

For the foregoing reasons, we urge this Court to reverse the decision of the

District Court and order the arbitration of the IBEW's grievance.


Respectfully submitted,

     /s/ Robert E. Paul
Robert E. Paul (194787)

Zwerdling, Paul, Kahn & Wolly, P.C.
1025 Connecticut Avenue NW
Suite 712
Washington, DC 20036-5420
(202) 857-5000
(202) 223-8417 fax
rpaul@zwerdling.com

Attorneys for Appellant
IBEW Local 1200

CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2013, a copy of Appellant's Brief, filed this day, was served via CM/ECF on Donald J. Munro, Esq., Jones Day, 51 Louisiana Avenue NW, Washington, DC 20001-2113.


/s/Robert E. Paul
Robert E. Paul

# ADDENDUM

United States Code Annotated
  Title 29. Labor
    Chapter 7. Labor-Management Relations (Refs & Annos)
      Subchapter IV. Liabilities of and Restrictions on Labor and Management

29 U.S.C.A. § 185

§ 185. Suits by and against labor organizations

Currentness

<Notes of Decisions for 29 USCA § 185 are displayed in twenty-three separate documents. Notes of Decisions for subdivision I are contained in this document. For Notes of Decisions for subdivisions II to XXIII, see documents for 29 USCA § 185, post.>

(a) Venue, amount, and citizenship

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

(b) Responsibility for acts of agent; entity for purposes of suit; enforcement of money judgments

Any labor organization which represents employees in an industry affecting commerce as defined in this chapter and any employer whose activities affect commerce as defined in this chapter shall be bound by the acts of its agents. Any such labor organization may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States. Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets.

(c) Jurisdiction

For the purposes of actions and proceedings by or against labor organizations in the district courts of the United States, district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in representing or acting for employee members.

(d) Service of process

The service of summons, subpena, or other legal process of any court of the United States upon an officer or agent of a labor organization, in his capacity as such, shall constitute service upon the labor organization.

(e) Determination of question of agency

For the purposes of this section, in determining whether any person is acting as an "agent" of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or

subsequently ratified shall not be controlling.

**CREDIT(S)**
(June 23, 1947, c. 120, Title III, § 301, 61 Stat. 156.)

Notes of Decisions (394)

29 U.S.C.A. § 185, 29 USCA § 185
Current through P.L. 113-13 approved 6-3-13

**End of Document**                                 © 2013 Thomson Reuters. No claim to original U.S. Government Works.